MYRTLE ANNIE SEGAR, as Executrix, etc., Plaintiff, *v.* KING FEATURES SYNDICATE, INC., Defendant.

Supreme Court, Special Term, New York County, September 16, 1940.

*Fanny E. Holtzmann* [*Jacob L. Holtzmann* of counsel], for the plaintiff.

*McCauley & Henry* [*Charles Henry* of counsel], for the defendant.

BERNSTEIN, J. This action has been brought by the plaintiff, as executrix of Elzie Crisler Segar, for an accounting of moneys alleged to have been derived by the defendant from its licensing of persons, firms or corporations to exercise toy, novelty, song, book, motion picture, talking picture, stage and radio rights in and to the characters which appeared in certain comic strips drawn by the plaintiff's testator, and for a decree directing that, by reason of the defendant's failure to make such accounting and pay over the amount due thereunder, the plaintiff be restored to all property rights in such characters. The defendant has countered by setting up the two contracts involved in the action and asserting that, under a proper construction of those contracts, it has accounted to the plaintiff and her testator for all moneys which became due to them thereunder.

The plaintiff's testator was a well-known cartoonist who, under a series of successive contracts dating from 1919, had been drawing and supplying comic strips to the defendant on a fixed weekly salary basis. All of those contracts provided, amongst other things, that the defendant was to have legal title to all the drawings and characters therein, and the right to register them in its own name, syndicate them for republication and otherwise make such use of them as it deemed advisable. That the plaintiff's testator fully divested himself under those contracts of all rights in the drawings and characters so furnished by him is best evidenced by the circumstance that, on several occasions during the life of those contracts, he asked for and received the express permission of the defendant to republish some of his own comic strips and to use its rights in the characters appearing in those strips for his own benefit, but subject always to the defendant's rights of ownership thereof.

On April 7, 1932, the parties renewed their printed form contract for a period ending July 14, 1938, at an increased weekly stipend, but accompanied it with a separate typewritten contract under which the defendant assigned to the plaintiff's testator the toy, novelty, song and book rights to certain characters created by him, and agreed to act as his agent in the disposal of those rights and remit to him the net proceeds thereof, and to pay him fifty per cent of all sums received by it from the sale of the moving picture, talking picture or theatrical rights to those characters. This latter arrangement was modified slightly on December 28, 1932, and both contracts, as so modified, continued in operation until the execution on May 23, 1938, of the two contracts involved here. All of those antecedent contracts are important only because of the light that they cast on the intention of the parties when they entered into those two last contracts.

In November, 1937, the plaintiff's testator became seriously ill. The defendant made an effort during this period of illness to negotiate the new contracts with him, but was unable to do so. In May, 1938, the plaintiff's testator recovered sufficiently to enable the defendant's vice-president and comic editor, Mr. Kelly, to bring the contracts to his home in California and have him sign them. Like the contracts which immediately preceded them, one was on a printed form while the other was typewritten. The former provided that for a period ending on July 13, 1943, the plaintiff's testator was to draw for and deliver to the defendant six comic strips and one Sunday comic page per week, the characters of which were to become the exclusive property of the defendant for all purposes, and the defendant was to pay the plaintiff therefor the sum of $1,000 per week (which was to be reduced under certain circumstances). The typewritten contract was intended to provide for a specific division of the proceeds derived by the defendant from the licensing of those who might want to use the characters depicted in the strips. Since a proper interpretation of the latter contract will be determinative of this whole controversy, it is necessary to set it forth at some length: " Dear Mr. Segar: In consideration for our entering into a new contract for the continuance of your services dated the 23 day of May, 1938 and executed simultaneously herewith: 1. For a period beginning with the execution of this contract and extending to and including the 13th day of July 1943, or so long as you perform your services under said contract (the shorter period shall govern) the undersigned [King Features Syndicate, Inc.] hereby agrees to account to you to the extent of 75% of all monies actually derived by it from the licensing of other persons, firms or corporations to exercise toy, novelty, song and/or book rights, or any part of said rights, in and to the characters, * * *. 2. The undersigned hereby further agrees, during the same period as hereinabove provided, to account to you to the extent of 50% of all monies actually derived by it from the licensing of other persons, firms or corporations to exercise motion picture, talking picture, theatrical (meaning stage) and/or radio rights utilizing or based upon the aforesaid characters, * * *. Your acceptance noted hereon will constitute this a contract between us. Very truly yours, King Features Syndicate, Inc. by J. V. Connolly. (Sgd.) Elzie Crisler Segar."

The parties continued to operate under those two contracts until October 13, 1938, when the plaintiff's testator died. The weekly payments of $1,000 were continued for several weeks after his death, and three royalty checks aggregating $7,077.18, with accompanying statements, were sent to the plaintiff between November 15,

1938, and April 20, 1939. By these remittances the defendant paid the plaintiff the appropriate percentages of all moneys received by it from licensees prior to October 13, 1938, the appropriate percentages of moneys which came in from licensees after that date but which under the license agreements were properly due and payable before that date, the appropriate percentages of moneys which came in after that date but which were paid by the licensees with respect to sales made by them before that date, and the appropriate percentages of one-half the moneys received by the defendant after October 13, 1938, with respect to sales made by its licensees during the entire month of October, 1938. It is conceded that the defendant made no accounting for moneys received by it from licensees after October 13, 1938, on license agreements in force on that date and which were properly due and payable under said agreements after that date, or for such moneys as were paid by those licensees with respect to sales made by them after that date. It is conceded also that it made no accounting for moneys received by it on license agreements made or becoming effective after October 13, 1938.

The plaintiff contends that this typewritten contract should be construed so as to require the defendant to account to her for all royalties received by it from licensees to the date of the trial, regardless of whether the license agreements were entered into before or after October 13, 1938. That contention rests on the reasoning that the contingency of death was not in contemplation of the parties when they limited the term of the royalty contract to " so long as you perform your services under said (service) contract," and hence that, while the death of the plaintiff's testator excused him from further performance under the service contract, it did not operate to deprive his estate of his share of the royalties thereafter earned, particularly in face of the circumstance that he had transferred his property rights in the characters depicted in the strips in reliance on the promise to account for those royalties.

Aside from the fact that the property rights in the characters had been transferred under the service contract of May 23, 1938 (and even prior service contracts), and not under the royalty contract in question, the plaintiff's interpretation of the words " so long as you perform your services under said contract " as meaning " so long as you shall not breach said contract," gives a far-fetched and distorted meaning to clearly expressed language. The case cited by the plaintiff to sustain her interpretation (*Matter of Bucini* v. *Paterno Constr. Co.*, 253 N. Y. 256) is authority only for the proposition that sickness or death will not excuse payment for personal services actually rendered. It is not authority for the

proposition that payment must also be made for work not done at all. Here the words used had a very definite meaning. They fixed the term of the contract as from May 23, 1938, to the date that the plaintiff's testator might cease performance of his personal services, be it voluntarily or involuntarily. That term came to an end with the death of the plaintiff's testator on October 13, 1938, and whatever rights and obligations arose from that contract must, therefore, be adjusted as of that date.

What was the defendant obligated to account for on that date? Obviously not for royalties arising out of license agreements entered into after October 13, 1938, as claimed by the plaintiff, for, being already possessed of title to the strips and the characters under the printed contract, the defendant was merely revested at that time with the right to sell them, lease them or permit their use by others free from the obligations of the expired typewritten contract.

The defendant contends, however, that it was only obligated to account, as of October 13, 1938, for the appropriate percentages of moneys which it had actually received from licensees during the period between May 23, 1938, and October 13, 1938. The language of the contract does not sustain such a meaning. It says that the defendant is to account for a percentage " of all monies actually *derived* by it from the licensing," etc. The words " monies derived " are not synonymous with the words " monies received," for they must reasonably be interpreted to include not only moneys received but also moneys receivable. So interpreted, the contract means that the defendant was to account for the appropriate percentages of all moneys derived by it from licensing agreements actually entered into during the period between May 23, 1938, and October 13, 1938, and in force on the latter date, to the expiration dates of said agreements, irrespective of when such moneys were actually received by the defendant. That, of course, cannot include moneys derived by the defendant from extensions or renewals of such licensing agreements, effected after October 13, 1938, as contended for by the plaintiff.

In arriving at the conclusion that that is what the parties intended by their contract, this court has been guided only by its interpretation of the language of the contract itself. It has found no ambiguity in that language and has had no occasion to consider any evidence of the circumstances surrounding the transaction, or the practical construction placed upon the contract by the parties while they were acting under it, or the fact that the contract was prepared by the defendant. (*Matter of Loew's Buffalo Theatres, Inc.*, 233 N. Y. 495, 501; *Brainard* v. *New York Central R. R. Co.*, 242 id. 125, 133.) Moreover, while this conclusion by the trial court

accords with that of Mr. Justice Pecora upon his decision of the defendant's motion for summary judgment (*Segar* v. *King Features Syndicate, Inc.*, 173 Misc. 1036; affd., 259 App. Div. 871), it is not the result of any holding, as urged by the plaintiff, that such decision or its affirmance is conclusive of the question on the trial. (*Standard Accident Ins. Co.* v. *Marks*, 233 App. Div. 466, 467.)

Since it is conceded that the payments made by the defendant did not include the appropriate percentages of all moneys received by it after October 13, 1938, on license agreements in force on that date, the plaintiff is entitled to an interlocutory judgment of accounting to the extent hereinabove indicated.

Settle judgment providing for the appointment of a referee to take and state the account.